UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

FRANCOIS ROBERT GEVAERTS,
CHRISTIAN HOLSTEIN GEVAERTS,
ALEXANDER CASPER HOLSTEIN GEVAERTS,
PIETER SCHAFFELS, AND SCHAFFELS
BEHEER B.V., individually and
on behalf of all others similarly situated,

        Plaintiffs,

v.                                       Jury Trial Demanded

TD BANK, N.A., DEBORAH C. PECK,
DENNIS MOENS, SIMON FRANCISCUS
WILHELMUS LAAN, WATERSHED
 LLC, ZILWOOD S.A., CRYSTAL
LIFE CAPITAL, S.A., RUNNING2
LIMITED, BEST INVEST EUROPE,
LTD, JENNIFER J. HUME, JENNIFER J.
HUME, C.P.A., P.C.,

        Defendants.

_____/

## CLASS ACTION COMPLAINT

     Plaintiffs Francois Robert Gevaerts, Christian Holstein Gevaerts, Casper Holstein

Gevaerts, Pieter Schaffels and Schaffels Beheer B.V., individually and on behalf of all other

persons similarly situated (the "Plaintiffs"), sue Defendants TD Bank, N.A., f/k/a Commerce

Bank, N.A. ("TD Bank"), Deborah C. Peck ("Peck"), Dennis Moens ("Moens"), Simon

Franciscus Wilhelmus Laan ("Laan"), Watershed, LLC ("Watershed"), Zilwood, S.A.

("Zilwood"), Crystal Life Capital, S.A. ("Crystal Life"), Running2 Limited ("Running2"), Best

Invest Europe, LTD ("Best Invest"), Jennifer J. Hume ("Hume"), Jennifer J. Hume, C.P.A., P.C.

("Hume P.C.), to recover their investment losses and for equitable relief.

## **INTRODUCTION**

1.      This Complaint arises from a life settlement offering, which solicited investments from foreign investors.

2.      A life settlement is an investment vehicle in which a chronically ill or elderly insured sells the future right to receive the death benefits of their life insurance policy to one or more investors in exchange for a lump sum cash payment equal to a percentage of the policy's face value.

3.      This case arises out of the sale of fractional shares in these life settlements to investors who collectively make up the Class of individuals who were harmed by the unlawful conduct of the Defendants.  The underlying life insurance policies were acquired in Miami-Dade County, in the Southern District of Florida and elsewhere.  The offering materials related to these investments assured investors that a licensed attorney would serve as escrow agent and trustee and would safeguard both their investment funds and the insurance policies they would be used to purchase.  Unbeknownst to Plaintiffs and the Class, but well known to the Defendants, neither the investors' investment funds nor the life insurance policies that some of those funds were used to purchase were safeguarded.  Instead, funds held in attorney trust accounts at Defendant TD Bank were misappropriated, commingled and overdrawn, and life insurance policies were not kept in the trusts that Defendant Deborah Peck was supposed to establish.

4.      As described in more detail below, Plaintiffs and the Class lost over $223 million as a result of numerous and repeated breaches of fiduciary duty, acts of legal malpractice, negligent acts, aiding and abetting these violations and other actionable misconduct by the Defendants.

2

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5 million, exclusive of interest and costs, and this matter is a class action in which at least one member of the proposed class is a citizen or subject of a foreign state and at least one Defendant is a citizen of a state.

6.     This Court has jurisdiction over the Defendants because:

    (a)   each Defendant either resides, or transacts business, within this judicial district; and

    (b)   each Defendant is amenable to service of process within the meaning of Federal Rule of Civil Procedure 4(e)-(f).

7.     Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the Defendants either reside, or transact business, in this district and this district is where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

8.     Plaintiff Francois Robert Gevaerts is a citizen of the Netherlands who invested hundreds of thousands of dollars in the Defendants' scheme.

9.     Plaintiff Paul Christian Holstein Gevaerts is a citizen of the Netherlands who invested hundreds of thousands of dollars in the Defendants' scheme.

10.     Plaintiff Alexander Casper Holstein Gevaerts is a citizen of the Netherlands who invested hundreds of thousands of dollars in the Defendants' scheme.

11.     Plaintiff Pieter Schaffels is a citizen of the Netherlands who invested hundreds of thousands of dollars in Defendants' scheme.

12.     Plaintiff Schaffels Beheer B.V. is a closely held Dutch company with its principal place of business in the Netherlands.  Schaffels Beheer invested hundreds of thousands of dollars in Defendants' scheme.

13.     Defendant Peck is a resident and citizen of the State of Florida, but was licensed to practice law in the State of New Jersey only.  Despite the fact that Peck was not licensed to practice law in the State of Florida, Peck owned and operated a law office in the Southern District of Florida.  In the course of her practice of law, Peck maintained New Jersey IOLTA attorney trust accounts with Defendant TD Bank, which she used to solicit, convert, and misappropriate approximately $223 million from Class members.  Peck held herself out to Plaintiffs and the Class as the trustee of over fifty (50) Florida trusts purportedly formed to hold life insurance policies beneficially owned by the Class members, including Plaintiffs.  In addition, Peck was, and is, engaged in substantial and not isolated activity in the State of Florida sufficient to subject her to the personal jurisdiction of this Court under Fla. Stat. § 48.193 and meets the continuous and systematic contact requirements for general jurisdiction under the Fourteenth Amendment to the Constitution of the United States.

14.     Defendant Moens is a foreign citizen who, together with Peck and Laan, acted as a principal of the Quality Investments offering.  Moens was primarily responsible for the acquisition of insurance policies, including in Miami-Dade County, in the Southern District of Florida and elsewhere, and the maintenance of those policies.  These policies were held in trust by Peck, fractionalized and sold to the members of the Class.  On multiple occasions, Moens traveled to the Southern District of Florida to conduct business, including the execution of legal documents necessary for the conduct of the offering.  Moens also directed the activities of participants in the scheme in the Southern District of Florida.  Thus, in addition to its specific

4

wrongful activities described below, Moens engaged in substantial and not isolated activity in Florida sufficient to subject him to the personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the continuous and systematic contact requirements for general jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

15.     Defendant Laan is a foreign citizen who, together with Peck and Moens, acted as a principal of the Quality Investments offering.  Laan was primarily responsible for the marketing and sale of investment interests the members for the Class.  On multiple occasions, Laan traveled to the Southern District of Florida to conduct business related to the Quality Investments offering.  Laan also directed the activities of participants in the scheme in the Southern District of Florida.  In addition to his specific wrongful activities described below, Laan engaged in substantial and not isolated activity in Florida sufficient to subject it to the personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the continuous and systematic contact requirements for general jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

16.     Defendant Watershed is a limited liability company formed under the laws of the Republic of Seychelles with an administrative office at 6EA-418, Dubai Airport Freezone, Dubai, United Arab Emirates.  Watershed is a shell corporation that is wholly-owned by Defendant Zilwood SA, itself a shell corporation wholly-owned by Moens.  Moens maintained an office for Watershed at Peck's unlicensed law firm in the Southern District of Florida. Furthermore, while in the Southern District of Florida, Moens caused Watershed to execute numerous Florida trust agreements for the purpose of soliciting, converting and misappropriating money purportedly held in trust for the benefit of Plaintiffs and the Class.  Watershed engaged in substantial and not isolated activity in Florida sufficient to subject it to the personal jurisdiction

of this Court under Fla. Stat. § 48.193, and meets the continuous and systematic contact requirements for general jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

17.     Defendant Zilwood is a Republic of Seychelles company owned and controlled by Moens.  Zilwood is a shell corporation employed as an alter ego entity to conceal Moens's 100% ownership interest in Watershed and to conceal Moens's illicit funds held in offshore accounts in Cyprus and the United Arab Emirates.  Specifically, Moens caused Peck to wire investor funds to a foreign bank account at Marfin Laiki Bank (Account No: *******7991) in Limassol, Cyprus held at various points in Zilwood's name.  As Moens' alter ego, Zilwood engaged in substantial and not isolated activity in Florida sufficient to subject it to the personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

18.     Defendant Running2 is a foreign shell company controlled by Moens with offices located at R4-7 Sheikh Hamdan, Dubai, United Arab Emirates.  Moens used Running2's foreign bank accounts to receive fraudulent transfers of misappropriated proceeds derived from unlawful conduct in the Southern District of Florida and elsewhere.  As Moens's alter ego, Running2 engaged in substantial and not isolated activity in Florida sufficient to subject it to the general personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

19.     Defendant Crystal Life is a limited liability company formed under the laws of the Republic of Seychelles.  Crystal Life is a shell corporation owned and controlled by Moens, who also serves as its director.  Moens caused Crystal Life to act as "Trustor" or "Settler" for Florida trusts purportedly formed to hold insurance policies fractionalized and sold in the Quality

6

Investments offering.  For example, while in the Southern District of Florida, Moens, acting on behalf of Crystal Life, executed the CLSF Trust XLIII Stichting Closed Life Settlement Fund UA DTD 5/7/2010 to purportedly create a Florida trust.  Thus, in addition to its specific wrongful activities described below, Crystal Life engaged in substantial and not isolated activity in Florida sufficient to subject it to the personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

20.     Defendant Best Invest is a foreign company controlled by Moens and Laan. Moens caused Best Invest to act as "Trustor" or "Settler" for Florida trusts purportedly formed to hold insurance policies fractionalized and sold in the Quality Investments offering.  For example, while in the Southern District of Florida, Moens, acting on behalf of Best Invest, executed the LSF Trust II Stichting Life Settlement Fund II UA DTD 5/8/2008 to purportedly create a Florida trust.  Thus, in addition to its specific wrongful activities described below, Best Invest engaged in substantial and not isolated activity in Florida sufficient to subject it to the personal jurisdiction of this Court under Fla. Stat. § 48.193, and meets the requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

21.     Defendants Moens, Watershed, Zilwood, Crystal Life, Running2, and Best Invest, are collectively referred to hereafter as the "Moens Defendants." As set forth above, Defendant Moens exercised actual and complete control over Watershed, Zilwood, Crystal Life, Running2 and Best Invest, and used each entity for an improper purpose in the scheme.

22.     Defendant TD Bank is a national banking association with its executive offices in Cherry Hill, New Jersey, its principal place of business in Portland, Maine, and its regional headquarters at 2333 Ponce de Leon Boulevard in Coral Gables, Miami-Dade County, Florida.

TD Bank holds itself out as one of the fifteen largest commercial banks in the United States.  It is a wholly owned subsidiary of TD Bank Financial Group of Toronto, Canada.  TD Bank operates more than 1,000 retail banking locations in fifteen states and the District of Columbia, offers banking services to more than 7 million customers, and has total assets in excess of $150 billion.

23.     TD Bank has offices throughout the State of Florida, including in Miami-Dade County.  TD Bank  was, and is, engaged in substantial and not isolated activity in the State of Florida sufficient to subject it to the general personal jurisdiction of this Court under Fla. Stat. § 48.193 and meets the continuous and systematic contact requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

24.     In March 2008, TD Bank acquired Commerce Bank and its legacy, branches, systems and customer accounts, including accounts opened by Deborah Peck.  TD Bank's integration of Commerce Bank was completed in September 2009.

25.     Defendant Jennifer J. Hume is a certified public accountant who resides in and is a citizen of the Southern District of Florida.  Defendant Hume was engaged to provide professional services to each of the trusts for the benefit of Plaintiffs and the Class.   Defendant Hume engaged in substantial and not isolated activity in the State of Florida sufficient to subject her to the general personal jurisdiction of this Court under Fla. Stat. § 48.193 and meets the continuous and systematic contact requirements for jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

26.     Defendant Jennifer J. Hume, CPA, a Professional Corporation ("Hume P.C.") is a Florida corporation with principal offices in the Southern District of Florida.  Hume P.C. was engaged to provide professional services to each of the trusts for the benefit of the members of Plaintiffs and the Class.   Hume P.C. engaged in substantial and not isolated activity in the State

8

of Florida sufficient to subject her to the personal jurisdiction of this Court under Fla. Stat. § 48.193 and meets the continuous and systematic contact requirements for general jurisdiction under the Fourteenth Amendment of the Constitution of the United States.

## FACTS

### A.   THE MOENS DEFENDANTS, LAAN, AND PECK SOLICIT INVESTORS TO PURCHASE INTERESTS IN LIFE SETTLEMENT POLICIES.

27.     Defendants Peck, Moens, and Laan, individually and through the Watershed, Zilwood, Crystal Life, Running2, Best Invest and other entities, worked together to acquire viaticated U.S. life insurance policies from life settlement providers, to convey those policies into Florida trusts formed and managed by Peck as trustee, and to sell fractional participations in those Florida trusts to European investors.

28.     Defendants Moens and Laan organized Quality Investments, N.A. ("Quality Investments"), a Dutch company with offices at World Trade Center Amsterdam, Strawinskylaan 1207, Tower A, Level 12, 1077 XX Amsterdam, Netherlands.  Through Quality Investments, Laan used the internet, prospectuses, high-quality marketing videos, a network of foreign sales agents, and investor word-of-mouth to induce investors in Belgium, the Netherlands, and Spain to buy interests in Florida trusts that the offering materials represented would be the repositories of the life settlement policies.

29.     A key element of the Quality Investments offering was the creation and maintenance of express trusts in the United States.  Each investment offered and sold at Laan's direction through Quality Investments was, in fact, a beneficial interest in a trust formed to hold and maintain a life insurance policy during the investment term, and to collect and distribute the policy's death benefit proceeds upon maturity.

30.     Prospectuses and other marketing materials Laan caused Quality Investments to

distribute uniformly promised investors "guaranteed" fixed rates of return.  The Quality Investments program offered investors several investment options.  The two most common options were the Bank Guaranteed Interest Fund ("BGIF") and the Closed Life Settlement Fund ("CLSF").  Investors who sought returns paid annually elected the BGIF prospectus, which promised guaranteed returns of 8% paid each year, with the principal returned upon either maturity of the policy (*i.e.* death of the insured) or at a predetermined date with the backing of a longevity reinsurance bond, whatever is first.  Investors willing to defer the receipt of the interest payments until the maturity date opted for the CLSF prospectus, which promised a higher annualized interest rate of 15%, which was paid along with the return of principal upon either maturity of the policy (*i.e.* death of the insured) or at a predetermined date with the backing of a longevity reinsurance bond, whatever first.

31.    The Quality Investments offering materials, created under Laan's direction, uniformly assured investors that the fractionalized life insurance policies would be held in a U.S. trust under the care and supervision of Deborah C. Peck, a licensed attorney-trustee, for the direct benefit of the investor-beneficiaries.

32.    Each insurance policy fractionized and sold by Laan through Quality Investments was marketed as a separate and segregated life settlement fund investment but they were all the same in all material respects.  Although the investments were marketed to foreign investors, the *sine qua non* of each life settlement investment was the transfer of money to Peck's IOLTA trust account at TD Bank (formerly Commerce Bank) to purchase a right to receive a larger future payment (*i.e.* a profit) directly from a Florida trust.

33.    The Quality Investments offering materials, created under Laan's direction, provided a detailed description of the alleged investment opportunity and, more importantly, the

mechanisms in place that would protect investors and their funds.  According to these materials, investor funds sent to Peck's fiduciary account at TD Bank would be used to purchase a specific life insurance policy insuring the life of a particular individual.  During the investment term, each life insurance policy would be held in a trust administered by Peck, as trustee, for the benefit of the investor-beneficiaries.

34.    The offering materials promised that a variable portion of the invested capital would be safeguarded to pay anticipated premiums.  For any premiums not prepaid as part of the initial investment, investors would wire the additional premium funds directly to one of Peck's Trust Accounts.  The offering materials assured investors that the insurance policy at the core of their investment would be held in trust for their benefit by Peck, and upon maturity their returns and principal would be paid directly by Peck, as their trustee.

35.    Investors were told that their returns were "guaranteed" in two ways:  that Quality Investments deposited sufficient funds with a top-rated American bank (identified in many cases as TD Bank) to insure that interest payments could continue to be made through the term of the investment, and the payment of the insurance policy death benefits on or before the "maturity date" was reinsured by a "bond" issued by a sound (but unidentified) financial institution. Therefore, each investor was guaranteed that he would receive one-hundred percent (100%) of their invested principal and promised returns on or before the specified maturity date.

36.    Describing the protections afforded by the use of U.S. trusts, the prospectus informed potential investors that "[a] Trust is an agreement between three parties: the 'settlor', 'trustee' and 'beneficiary'."  The "settlor" was identified as the party that irrevocably conveys the life settlement policy (and the reinsurance bond on that policy) into the trust.  Once the insurance policy was conveyed into the trust, investors were assured the trust could not be altered

or rescinded by the settlor.  Investors were further informed that the trustee was an independent, licensed professional who administered the trust's assets.  The prospectus and marketing materials explained that Peck would serve as the investors' trustee.  As the "beneficiaries" of the U.S. trust, the investor participants were promised a direct entitlement to interest and principal payments directly from the trust.  Investors were assured their invested capital and promised returns flowed directly to and from the trustee, and therefore would remain separate from Quality Investments.

37.     Quality Investments's offering materials, created under Laan's direction, promised Plaintiffs and the Class that, upon investing in the Quality Investments offering, investors' money would be held in escrow in a New Jersey attorney IOLTA trust account at TD Bank.  These marketing materials assured investors that any misconduct by a U.S. attorney-trustee would be detected by regulatory gatekeepers.

38.     With Peck's knowledge and consent, investors were solicited using marketing materials that touted Peck's role as trustee for their funds, her admission to practice law, and the applicability of the rules of professional conduct and disciplinary rules for lawyers to her and her management of investor funds.  Peck's responsibilities as trustee were set out in the numerous but materially identical trust agreements for each life settlement policy, each invoking the Florida Trust Code as governing law.  The identities of those investors were known to her because they were listed in appendices to the trust agreements, and were the subject of email correspondence in which she participated.

39.     Peck informed investors that she was licensed to practice law in New Jersey and that her law firm was responsible for the "oversight, maintenance, and tracking" of the trusts.

40.     Over 1,000 investors sent their principal investment of money and prepaid

premiums by SWIFT wire transfer, with each transmission informing Defendant TD Bank that the respective depositor intended for the wire to be received by Peck, as a fiduciary, in her New Jersey IOLTA trust accounts (the "Trust Accounts").

41.     In total, investors wired over $200,000,000 to the Trust Accounts, with virtually every wire detailing the specific trust associated with the transfer.

**B.     PECK RECRUITS TD BANK AND THE HUME DEFENDANTS TO ASSIST IN THE SCHEME.**

42.     The Trust Accounts were subject to the requirements of New Jersey law, and specifically, New Jersey Rule of Court 1:21-6. That rule requires, among other things, that New Jersey attorneys maintain separate fiduciary accounts and that accounts maintained in a fiduciary capacity "be prominently designated as an 'Attorney Trust Account.'" It also requires that financial institutions maintaining attorney trust accounts be approved by the New Jersey Supreme Court, after submission of an agreement "to report to the Office of Attorney Ethics in the event any properly payable attorney trust account instrument is presented against insufficient funds."

43.     TD Bank consented and agreed to these reporting obligations and other requirements with respect to attorney trust accounts, including those Trust Accounts maintained by Peck.

44.     TD Bank, at the request of Peck, opened and maintained the Trust Accounts. TD Bank was featured in the offering materials as the bank holding the Trust Accounts.

45.     The Trust Accounts were designated as "trust" or "escrow" accounts or contained the short-form designation "ITF," meaning "in trust for." TD Bank knew the Trust Accounts were being used by Peck to hold funds belonging to other persons, which she possessed incident to her practice of law, and therefore were required to be maintained in accordance with the New

Jersey rules regulating the practice of law.

46.    TD Bank also knew that incoming wire transfers were intended to be held in trust because of references to "trust" or "escrow" in wire transfer requests, wire advices, and/or confirmations.

47.    TD Bank also knew the intended purposes of incoming wire transfers into the Trust Accounts because the "reference for beneficiary" line of the wire advices received by TD Bank indicated the nature of the payment and the specific trust to which the payment related.

48.    TD Bank holds itself out as a "critical gate-keeper in the prevention of fraud and illegal money-laundering." Its concedes that "duties related to this gate-keeper function arise, among others, through applicable domestic and foreign laws and regulations, through contractual relationships with other participants in the international financial network, and through the banks' direct interactions with the public." TD Bank represents that "[a]mong the most critical of its gatekeeper functions, TD Bank is required to obtain and communicate important information about the source and purpose of remittances sent by TD Bank to and received by TD Bank from foreign accounts."

49.    From at least 2008, the Hume Defendants provided legal and accounting services to each of the Florida trusts.  The Hume Defendants created the trust documents used by Peck, provided tax compliance advice, and counseled Peck on important legal issues affecting the trusts and the Class as beneficiaries of the trust.  At Peck's request and instruction, the Hume Defendants regularly opined on the application of state and federal law and interpreted rights and responsibilities under the legal documents purporting to create the Florida trusts.  These and other professional services clearly exceeded accounting services, and constituted actionable unlicensed practice of law in the State of Florida.

50. The Hume Defendants issued reports to the investors that claimed she and her firm performed accounting on the trusts and represented to confirm that each trust retained a year's worth of premium payments within a premium account. The Hume Defendants also provided Peck with a letter of authority, later provided to investors, stating that each trust was in full compliance with all IRS requirements.

### C.   PECK AND THE MOENS DEFENDANTS MISAPPROPRIATE INVESTOR FUNDS.

51. Defendants Peck, Moens Defendants, and Laan, with the help of TD Bank as set forth below, caused investor funds wired to the Trust Accounts to be comingled such that funds invested for a specific purpose were used to pay unrelated premium obligations or even worse, to pay out money to other investors and participants in the scheme, including Defendants Peck and the Moens Defendants. Peck and the Moens Defendants mismanaged the policies by, among other things, transferring the policies to shell corporations outside of the trusts, allowing the policies to lapse for failure to pay premiums, and investing funds in policies ineligible for investment.

52. To conceal the Moens Defendants' and Peck's illegal activities from regulators and the investing public, these Defendants used Watershed, Best Invest and Crystal Life, each a foreign shell company, to conduct business in Florida. Specifically, Moens used Watershed, Best Invest and Crystal Life to acquire viaticated insurance policies from viatical and life settlement providers pursuant to contracts that he executed in Peck's unlicensed law office in Florida. In most instances, upon acquisition of the viaticated insurance policies, Moens purported to cause Watershed, Best Invest and Crystal Life to convey title of the policies to Florida trusts, often at artificially inflated prices. Thereafter, those policies were supposed to be held in trust for the benefit of the investor beneficiaries. Instead, none of the policies were treated

as trust *res*, and Peck and Moens Defendants continued to exert complete and unfettered dominion over the policies.

53.     Peck used the Trust Accounts to operate the life settlement scheme.  Investor funds were commingled in the Trust Accounts and Peck used those funds as she saw fit, without any regard for the investment, life policy, or trust, for which the funds were provided by the investor.  This commingling of funds, by and through TD Bank, enabled the Moens Defendants and Peck to divert new investor money, intended to be set aside to pay premiums on policies specifically assigned to those new investors, to pay premiums on policies assigned to earlier investors or to be redirected to the Defendants.  The comingling also eliminated the protections that should have been enjoyed by the individual trusts, and subjected all policies in the Quality Investments program to equitable cross-claims by other investors who wired funds to the comingled accounts.

54.     Peck's misconduct, including widespread misappropriation from the Trust Accounts, placed investors at a serious risk of loss.  These actions impaired Peck's ability to make premium payments on existing life insurance policies, resulting in the lapse of a number of policies and the loss of investment value to Class members.

55.     The misappropriation by the Moens Defendants and Peck also led to deficiencies in her comingled fiduciary accounts.  Peck was allowed to systematically wire funds between and among apparently separate fiduciary accounts even when those transfer left at least one account overdrawn.  The Moens Defendants and Peck did not disclose to investors, until it was too late, that there were serious cash deficiencies in the Trust Accounts.

56.     Contrary to the assurances in the offering materials, Peck was not an independent trustee.  Instead, Moens and Laan had complete control over the account and often instructed

16

Peck to transfer investor money to foreign accounts, pay premiums, purchase policies, pay accountants and other professionals, and pay for personal purchases.

57.     In connection with the scheme, Peck collected exorbitant fees charged for the maintenance and servicing of the policies.

**D.     PECK AND THE MOENS DEFENDANTS MISHANDLE THE LIFE INSURANCE POLICIES.**

58.     To acquire policies for this investment offering, Peck and Moens caused Watershed, Best Invest and Crystal Life  to purchase life insurance policies from life settlement providers. These policies were supposed to be held in trust for the benefit of investor-beneficiaries.  Instead, the policies were not properly conveyed into valid express trusts.

59.     Peck and the Hume Defendants often failed to create the Florida trusts until weeks or months after the investors' money was collected and the subject policy was purchased.  In those instances, Peck and the Hume Defendants backdated documents and left trust agreements incomplete, undertaking no reasonable efforts to ensure that the insurance policies were irrevocably titled in the name of the purported trusts.

60.     Although the most recent version of each Florida trust agreement purports to reflect an interest in a specific insurance policy on an exhibit, usually marked "Exhibit I," the insurance policies were never irrevocably conveyed to the trusts.  Instead, Peck and Moens retained full and unfettered dominion and control over the insurance policies, without any transparency to the investor-beneficiaries.

61.     Later, Peck, working with the Hume Defendants, dramatically altered the structure of the Florida trusts.  Without the consent of the trust beneficiaries, Peck secretly conveyed each insurance policy away from its irrevocable Florida express trust to newly formed shell Florida corporations, which she owned and controlled.  To replace the misappropriated trust

*res*, Peck created notes payable by each corporation to the trusts for an amount equal to the misappropriated policy's face value.

62.     To conceal the fact that the policies were no longer held in the Florida trusts, Peck altered each trust's agreement by changing the exhibit that described the trust *res*.

63.     The Hume Defendants failed to undertake a reasonable investigation to confirm that the trusts' *res* were adequately segregated and protected.  The Hume Defendants also failed to perform a diligent accounting of the premium funds.  Furthermore, the Hume Defendants were negligent in their preparation and dissemination of reports which were used by the scheme's principals to induce new investments and to lull investors and to conceal past acts of misconduct.

64.     Peck's unilateral transfer of the insurance policies to Florida corporations that were unknown to the trusts' respective beneficiaries effectively reduced the unwitting beneficial owners of the policies to mere unsecured creditors.

65.     When the trust agreements were created and executed, the agreements regularly omitted legally required information, such as the identification of the trust *res*, evidence that the *res* was irrevocably conveyed to the trust, and the identities of the interested beneficiaries.  These legal deficiencies, and Peck's apparent disregard for the formalities necessary to support the formation of a trust under Florida law, often left the purported trusts unenforceable and the property of the trust exposed to misfeasance and malfeasance.

66.     To conceal the professional misconduct in the formation and maintenance of the trust, numerous gatekeepers abdicated their legal and professional responsibilities.  For instance, Peck often enlisted her spouse, Kel Bloomer, to improperly notarize Peck's signatures on the backdated and incomplete trust documents.   Furthermore, in contrast to representations in invoices issued to each trust, the Hume Defendants never audited the trust *res* and the federal

18

income tax risks known to the professionals were concealed from the at-risk beneficiaries.

67.     In truth and in fact, the express trusts formed by Peck and the Hume Defendants were legally insufficient to achieve the creation of legally enforceable express trusts.  Instead, the various trusts' *res* were entirely comingled through innumerable cross claims, financial mismanagement and comingling of funds used to pay the various polices' premiums.

## E.     PECK AND THE MOENS DEFENDANTS CONCEAL THE TRUTH FROM INVESTORS.

68.     Although the offering materials contained extensive descriptions of the investment offering, the materials omitted important facts about the mismanagement of Peck's Trust Accounts and the Florida trusts formed to hold the insurance policies, reinsurance bonds, and prepaid premium funds.  For instance, investors were not told that Peck was operating an unlawful law practice in Florida.  Peck's legal services performed in the drafting and organization of the various Florida trusts were well beyond the scope of her New Jersey law license and the deficient legal documents she and Hume prepared and executed exposed the investors to significant risk of loss.

69.     Peck, Laan and Moens never disclosed to investors that Peck used Florida trust documents that were not drafted or approved by a licensed attorney and that Peck failed to take reasonable efforts to maintain those trusts in accordance with Florida law.

70.     Additionally, the offering materials informed investors that their investments were insured by a solid financial institution.  In reality, the reinsurer, Provident Capital Indemnity ("PCI"), was a grossly undercapitalized Costa Rican company.

71.     PCI was eventually revealed to be a fraud.  Although Peck knew that PCI's collapse would expose the deficiencies in her Trust Accounts, Peck assured investors that their "investments in the life insurance policy held within the trust is secure.  All reserves are in place

and the policies will be continued to be serviced and maintained by the law firm."

72.    Peck failed to inform investors that the premium reserves were insufficient and that the policies, at that point held outside of the trusts in shell corporations, were far from secure.

### F.    TD BANK FACILITATES THE LIFE SETTLEMENT SCHEME.

73.    TD Bank knowingly allowed Peck to open over thirty (30) separately numbered fiduciary accounts (previously defined as the "Trust Accounts").

74.    TD Bank undertook no reasonable efforts to identify the investors' identity or the nature of their investment of money, or to obtain an understanding of their relationship with Peck.  Furthermore, beyond soliciting additional business from Peck for TD Bank's capital markets division, TD Bank undertook no reasonable efforts to investigate the nature of the Peck's business.  For instance, TD Bank's capital markets department received copies of the BGI funds' Florida trust agreements identifying Peck as "Trustee" and sent account statements for Peck's New Jersey fiduciary accounts to her "Law Firm" in South Florida without confirming that she was licensed to practice law in that state.

75.    Despite the highly irregular and inappropriate pattern of activity in the Trust Accounts, TD Bank sent letters vouching for the Trust Accounts as accounts in "good standing" and vouching for Peck as a "valued" or "highly valuable" customer (the "TD Bank Vouching Letters").  These letters were sent as the Trust Accounts were being overdrawn, comingled, and converted.  By the TD Bank Vouching Letters, the bank guaranteed that Peck, Moens, and Laan could carry out their scheme.

76.    For example, one of the TD Bank Vouching Letters, from Assistant Manager Sarah Sampson (a TD Bank employee in New Jersey), stated:

Please accept this letter as confirmation that Deborah C. Peck currently maintains her attorney escrow accounts with TD Bank. All of Ms. Peck's accounts are presently in excellent standing. Ms. Peck is considered a highly valuable customer to TD Bank.

77.     Sampson volunteered that if the recipients had "further questions or verification needs" they should call her.

78.     In another letter, TD Bank represented:

As of April 21, 2009, the business in the account of "Premium Reserve II" held in the attorney trust account of Deborah C. Peck holds a balance of $600,000.00. Please note that Deborah C. Peck has kept the account in good standing and is recognized as a valued customer of TD Bank.

79.     In reality, TD Bank had opened this account for Peck the day before, on April 20, 2009. And, just three days after TD Bank vouched for the "good standing" of this account, Peck drew down the balance in this account to $167,500. Three weeks later, she drew the balance down again to only $5,000. TD Bank, however, never rescinded its vouching letter or informed the recipients of these negative, material changes.

80.     TD Bank's letters lulled investors into believing that a regulated U.S. financial institution was keeping watch over these trust based transactions and the individuals and entities, including Peck and Watershed, that were involved in them.

81.     The TD Bank Vouching Letters enabled Peck to represent falsely in her annual report to investors that "all trusts and its corpus are current with premium payments and have, retained within the CLSF Premium Account held at Commerce Bank, NJ, a year's worth of premium payments, in the event they are required."

82.     The TD Bank Vouching Letters also evidence that TD Bank provided more than routine banking services in connection with the Trust Accounts. TD Bank was not merely a passive depository for the Trust Account assets. Rather, the bank substantially assisted in Peck's scheme by, among other things, vouching for Peck when requested and ignoring the irregular

activities in the Trust Accounts, including overdrafts in the Trust Accounts.

83.     The Class relied heavily upon TD Bank's involvement and actions.  TD Bank's participation was a substantial basis for their confidence in the legitimacy of the transactions and the safety of their funds.

84.     Despite having knowledge of Peck's misconduct, TD Bank failed to timely report Peck to the appropriate authorities.

85.     TD Bank knowingly permitted Peck to overdraw the Trust Accounts by honoring withdrawals and transfers from Trust Accounts with insufficient funds.  TD Bank knew that such conduct was in violation of the New Jersey rules governing attorney trust accounts and detrimental to Plaintiffs and the Class members.  TD Bank also knew it was a party to an agreement requiring that it immediately report such activities to the New Jersey Bar Office of Attorney Ethics.  Nonetheless, despite its obligation to do so under its agreements and New Jersey law, TD Bank never filed a report with the New Jersey Office of Attorney Ethics.

86.     TD Bank knew that not reporting the overdrawn Trust Accounts would prevent the New Jersey Office of Attorney Ethics from timely learning of Peck's serious misconduct and immediately suspending or disbarring Peck from the practice of law, as well as taking control of or appointing a receiver for the Trust Accounts.

87.      Had TD Bank complied with its reporting obligations under New Jersey law, the Moens Defendants and Peck would not have been able to continue to operate the life settlement scheme, take in more investor funds, and misappropriate those funds.

88.     In addition, TD Bank knew that Peck was not licensed to practice law in the State of Florida, but failed to report her unlicensed practice.  TD Bank knew that Peck's emails were subscribed with a return address at "the Law Firm of Deborah C. Peck" in the Southern District

of Florida.  TD Bank's own Master Service Agreement establishing the Trust Accounts was executed by Peck under the title of "Esquire" at her South Florida address.  These facts informed TD Bank that Peck was engaged in the unlicensed practice of law, a third degree felony pursuant to Fla. Stat. § 454.23.  Yet, TD Bank failed to report Peck to the Florida Bar until many years later.  By willfully disregarding Peck's misconduct, TD Bank aided and abetted Peck's unlicensed practice of law in Florida.

89.    TD Bank also failed to report the suspicious activity occurring in the Trust Accounts, which included, but was not limited to, substantial wire transfers to Cyprus, the United Arab Emirates, and other known money laundering destinations.  TD Bank ignored its duties to investigate imposed by the Bank Secrecy Act and federal Anti-Money Laundering regulations by ignoring Peck's conduct.  Had TD Bank complied with its reporting and investigatory obligations under these laws, Peck and her co-conspirators would not have been able to operate the scheme.

90.    The inappropriate nature of numerous of the transfers to, from, among and between the Trust Accounts was obvious on their face, supporting the sole inference of misappropriation.  Incoming transfers from investors indicating that they related to a specific trust were immediately comingled with funds in other accounts and converted.  For example, as discussed above, the wire advice for the $2,000,000 transfer from Running2 into the Premium Reinsurance trust account indicated that the transferred funds were for "PREMIUM PAYMENTS DARMANYAN POLICY, LINTON POLICY ELLIOT POLICY, JOHERPOLICY GUBERMAN POLICY."  Despite these instructions, this transfer was used by Peck and Moens to pay investors in the "LSF II" fund.  TD Bank knew that the funds were misappropriated to pay the LSF II investors because the wire instructions associated with the

outbound payments from the Premium Reinsurance account were inconsistent with the wire instructions on the Running2's inbound transaction that same day.

91.     Over the relevant period, hundreds of millions of dollars of Class members' funds were held and managed by TD Bank.

92.     Peck was indeed a "highly valuable customer."  TD Bank profited from its relationship with Peck and the transactions she conducted through the bank.  TD Bank sent and received wire transfers of large sums of money from investors' bank accounts in Europe, and sent wires on Peck's behalf all over the world.  Peck placed substantial sums of investor money that was supposed to be invested in life settlements in TD Bank certificates of deposit while those funds were awaiting transfer.  Peck's comingled Trust Accounts often held balances in the many millions of dollars, from which TD Bank profited.  It is no surprise, therefore, that TD Bank internally referred to Peck as "our favorite customer" and went to great lengths to keep her happy, while ignoring its obligations to monitor and report her unilateral activities.

93.     TD Bank knew that reporting the improper activity in the Trust Accounts to the appropriate authorities would result in the closing of the Trust Accounts maintained at TD Bank and the concomitant loss of profit to TD Bank.

G.     **SPECIFIC EXAMPLES OF DEFENDANTS' MISCONDUCT.**

**Peck and Moens Defendants Secretly Replace a Lapsed Policy**

94.     In early 2008, Quality Investments, under the direction of Laan, offered investors in Northern Europe the opportunity to invest in Columbus Life Insurance Company policy CM5017892U as part of a U.S. trust referred to as "CLSF XII."

95.     In January 2008, Plaintiff Francois Robert Gevaerts executed participation documents seeking to purchase a participation in CLSF XII.  On February 15, 2008, FR Gevaerts

wired funds to Peck's Trust Accounts. The wire contained SWIFT messaging that identified the CLSF XII trust. TD Bank made no inquiry about Gevaert's investment and requested no documents related to the CLSF XII trust.

96.     On March 14, 2008, Laan provided Francois Robert Gevaerts with a certificate evidencing his investment. The certificate expressly indicates that he held a beneficial interest in Columbus Life Insurance Company policy CM5017892U.

97.     On June 27, 2008, Columbus Life Insurance Company sent a notice to Watershed warning that policy CM5017892U would lapse if additional premiums were not timely paid.

98.     On August 22, 2008, the Hume Defendants, for the first time, provided Peck with an unexecuted Florida trust agreement purportedly creating the "The CLSF XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008." According to the preamble of the newly drafted documents, "This Declaration of Insurance Trust is made this 22nd day of January, 2008 by and between Watershed, LLC hereinafter called the Trustor and Settler, and Peck, of Palm Beach Gardens, Florida, hereinafter called the Trustee."

99.     Along with the back-dated trust agreement, the Hume Defendants' Invoice, dated August 22, 2008, seeking $750.00 in fees for "Professional Service" described as:

> Assistance in the preparation of the trust documents that gave life to the trust; advice as to the proper set-up of trust for income tax purposes to avoid negative tax consequences to both the foreign investors, the foreign syndicator and the local manager/trustee; Assistance with the US tax compliance of said trust, including the filing of form 56 and the obtaining of the US Tax Identification Number and all research related to the above matter.

100.     In addition to seeking fees for those unlicensed legal services, the Hume P.C. Invoice stated:

> The Trust will be charged $500 for a full accounting of its activity, which will result in an annual report that will be given to the Company and at the

Company's election, a copy of which may be submitted to each investor. Additionally, this fee includes the charge for the preparation and filing of its US income Tax Returns.

101.    On November 18, 2008, Peck received a notice by facsimile informing her that Columbus Life Insurance Company policy CM5017892U was in "Grace Period" and full payment was required to prevent a lapse.  Despite repeated written notices to Moens, Watershed and Peck, Columbus Life Insurance Company policy CM5017892U was allowed to lapse on November 3, 2008.

102.    Over the next three years, Peck and her coconspirators discussed numerous alternatives to deal with the lapse of Columbus Life Insurance Company policy CM5017892U. For example, one coconspirator suggested that Peck and Watershed pay the insured $10,000 to cooperate in efforts to obtain another policy.  They also discussed replacing Columbus Life Insurance Company policy CM5017892U with another insurance policy insuring the life of another individual.  Watershed and Peck even filed a federal lawsuit in the U.S. District Court for the District of Colorado seeking to compel Columbus Life Insurance Company to reinstate policy CM5017892U.  *See Watershed LLC v. Columbus Life Insurance Company*, Civil Action No. 09-CV-014960-MSK-MEH.

103.    Yet, Peck and her coconspirators never disclosed the lapse of Columbus Life Insurance Company policy CM5017892U to the beneficiaries of The CLSF XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008.

104.    Instead, on April 7, 2009, the Hume Defendants issued a compliance letter confirming that The CLSF XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008 "is domiciled in Florida…[and that] [a]ll Federal income tax requirements have been fulfilled by this trust as of today."

105.    On April 10, 2009, Peck issued a report to the investors stating that "the CLSF trusts," including "CLSF XII… Columbus Life Insurance Policy No. CM5017892U" is "current with premium payments and [I] have, retained within the CLSF Premium Account held at TD Bank, NJ, a year's worth of premium payments, in the event they are required."

106.    A few days later, TD Bank issued two letters, the first stating "To Whom it May Concern, As of April 17, 2009, the business in the account of 'CLSF Premium Reserve' held in the attorney trust account of Deborah C. Peck holds a balance of $738,377.00." The second TD Bank Letter stated "To Whom it May Concern, As of April 21, 2009, the business in the account of 'Premium Reserve II' held in the attorney trust account of Deborah C. Peck holds a balance of $600,000.00.  Each of these letters stated that Peck "has kept the account in good standing and is recognized as a valued Customer of TD Bank."

107.    The Hume P.C. compliance letter, the Peck Annual Report and the two TD Bank vouching letters were forwarded to Quality Investments for publication to investors on the Quality Investment website portal.  Despite numerous prior, contemporaneous and subsequent events which rendered the statements in these 2009 letters to investors false, none of the issuers of the 2009 letters attempted to retract, correct or complete their misleading investor disclosure. For example, TD Bank failed to cure the omission in its statements about the funds in Peck's Trust Accounts to disclose that the referenced funds were only recently transferred into those accounts, one of which was opened the prior day.

108.    In February 2011, the Defendants continued in the concealment of the facts and circumstances surrounding the lapse of Columbus Life Insurance Company policy CM5017892U.  On February 2, 2011, Peck responded to inquires about CLSF XII stating, "As Trustee of CLSF XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008, I would like to

confirm that the policy held by the trust referenced above is fully in force and that the premiums are current."

109.    By January 10, 2012, it was clear to Peck that the imminent collapse of the Quality Investments offering would reveal the extent of the bad conduct surrounding Columbus Life Insurance Company policy CM5017892U.  Peck again considered replacing the missing policy with a different policy.  In an e-mail forwarding the CLSF XII trust agreement to Watershed's attorney, Peck pondered whether the provisions of the agreement would protect her "if a US attorney starts a civil suit for breach of fiduciary duty or fraud."

110.    In August 2012, several members of the Class sought the protection of the U.S. Bankruptcy Courts.  In connection with civil discovery in that action, Peck produced numerous trust agreements, including CLSF XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008.  The agreement produced by Peck contained the same notarized signature pages as the 2008 version and identified the same beneficiaries; however, Exhibit II attached to the 2012 version reflected Lincoln Financial Group Policy No. LJ7023043.

111.    The breaches of fiduciary duty discussed above directly and proximately caused significant damage to Plaintiffs and the Class because the individual insured by Columbus Life Insurance Company policy CM5017892U passed away and had that policy been properly maintained and its premiums paid, Plaintiffs and the other members of the Class would have received the policy's $5 million in proceeds.  Instead, because the policy was not safeguarded in a trust and its premium moneys were converted and misappropriated, they lost their investment.

### Peck, the Moens Defendants, and Laan Cover Up an Ineligible Investment

112.    In 2007, Quality Investments offered foreign investors the opportunity to purchase fractional interests in a life settlement they referred to as the CLSF VI fund.

113.    On August 1, 2007, two investors each wired $190,000 in exchange for a participation in the CLSF VI fund.

114.    At or around that time, Moens caused Watershed to buy an insurance policy for $200,000, which Moens intended to use in CLSF VI.  However, shortly thereafter, a European attorney advised Moens and Peck that the policy was not fit for use with a life settlement, in part because the policy was still in the "contestability period."

115.    Instead of disclosing to investors that the CLSF VI's policy was inconsistent with Quality Investments offering materials, Moens, Laan and Peck announced that CLSF IV had matured.

116.    In November 2007, Peck wired approximately $350,000 to each of the investors who purchased participations in the CLSF VI fund.  Although these payments were wired from Peck's Trust Accounts containing other investors' money, the investors were misled to believe that the payments were funded by maturity of the insurance policy upon the death of the insured.

117.    Following the payment of false returns to investors in the CLSF VI fund, Laan caused Quality Investments to falsely tout the early maturity of a policy leading to a 75.44% annualized return to investors in only 4 months.  These inflated and unrealistic returns were used to solicit new investors through the remainder of the Class Period.

**Peck, the Moens Defendants, and Laan Falsely Attribute Investor**
**Payouts to a PCI Reinsurance Payment**

118.    Moens caused Best Invest to acquire a life insurance policy issued by John Hancock Life Insurance Company, policy number UL00266716. This life insurance policy had a face value of $2,000,000.   PCI issued a "Financial Guarantee Bond" on behalf of Best Invest promising to pay a reinsurance claim equal to the policy face value if the insured failed to expire by a date certain.

29

119.     Thereafter, Laan caused Quality Investments to offer and sell fractional investment interests in John Hancock Life policy UL00266716 to investors in Europe.

120.     Purportedly in 2008, Peck, Moens and Best Invest formed a Florida trust entitled LSF Trust II Stichting Life Settlement Fund II UA DTD 5/8/2008, known as LSF II.   Upon execution of the "Declaration of Trust," Moens caused Best Invest to convey John Hancock policy UL00266716 to Peck, as "Trustee," where it was to be held "in trust for the use and benefit of the following as described in Exhibit II."

121.     The individual insured by John Hancock policy UL00266716 failed to expire prior to October 5, 2010, and the investors who owned fractionalized interests in the policy expected Peck to collect and pay out the proceeds of the PCI Financial Guarantee Bond.

122.     On December 14, 2010, Peck submitted a written demand for payment of the $2,000,000 proceeds of the PCI Financial Guarantee Bond, which she instructed should be wired to her Trust Accounts with reference to "Crystal Life Capital."

123.     On January 3, 2011, PCI notified Peck that it did not have sufficient assets to timely pay the proceeds of the PCI Financial Guarantee Bond guaranteeing John Hancock policy UL00266716.

124.     On January 5, 2011, Peck instructed an employee to draft letters to the investors who owned interests in the policy stating that her "law firm is preparing to process your participation in LSF II."

125.     On January 12, 2011, Moens caused Running2 to wire $2,000,000 of investor money held in Dubai, U.A.E., to TD Bank account number 7760690037, one of Peck's Trust Accounts.   The SWIFT wire communication informed TB Bank that the Running2 wire was "PREMIUM PAYMENTS DARMANYAN POLICY, LINTON POLICY, ELLIOT POLLICY,

JOHERPOLICY GUBERMAN POLICY." (sic)  Prior to receipt of this wire, TD Bank account number 7760690037 held only $618.25.

126.    On January 13, 2011, Peck caused nine outgoing wire transactions, paying a total of $2,000,000 to the John Hancock policy UL00266716 investors.   Each request for an outgoing wire transaction informed TD Bank that the money being wired out of TD Bank account number 7760690037 related to a participation in LSF II.

127.    On January 14, 2011, Peck issued a letter to a business associate stating, "As Trustee of LSF Trust II, I am pleased to advise you that Provident Capital Indemnity (PCI) fulfilled its obligation to the above referenced financial guarantee bond this past week."

128.    On January 21, 2011, the United States Securities and Exchange Commission filed an emergency civil action against PCI.

129.    On January 25, 2011, Peck issued an open letter to the Class.   In that letter she wrote:

> This letter is to inform you of what actions I am taking as trustee of the CLSF and BGI trusts in response to the events surrounding the Complaint served on Provident Capital Indemnity, Ltd., on January 19, 2011, and the claims that can be pursued on your behalf.  It is important for me to communicate and emphasize that your investment in the life insurance policy held within the trust is secure.  All reserves are in place and the policies will continued to be serviced and maintained by the law firm. What I am doing is actively pursuing a claim with the US Court-appointed receiver on the beneficiaries behalf for the payments sent to PCI for the financial guarantee bonds.

130.    On March 22, 2011, Peck wired $2,000,0000 from the "BGIF BV" account at TD Bank to Running2's account in Dubai, U.A.E.

131.    On March 23, 2011, Peck wired $3,500,0000 from the "Premium Reserve" trust account at TD Bank to Running2's account in Dubai, U.A.E.

132.     On May 4, 2011, Peck wired $963,598.00 from the BGI II Trust Account at TD

Bank to Watershed's account in Dubai, U.A.E.

### TD Bank Allows Peck and the Moens Defendants to Overdraft the Trust Accounts

133.    On April 17, 2009 TD Bank wrote an open letter "To Whom it May Concern" vouching for the "good standing" of a specific attorney Trust Account maintained by Peck, the "CLSF Premium Reserve" account.

134.    TD Bank wrote:

> As of April 17, 2009, the business in the account of "CLSF Premium Reserve" held in the attorney trust account of Deborah C. Peck holds a balance of $738,377.00.

135.    TD Bank further represented that "Deborah C. Peck has kept the account in good standing and is recognized as a valued customer of TD Bank."

136.    Four days later, after having procured this vouching letter from TD Bank, Peck caused there to be eight wire transaction withdrawals from the account, drawing the balance down and ultimately creating an overdraft in the account of negative $2,765.00.

137.    Peck allowed this account to remain overdrawn for several days until April 23, 2009.

138.    Despite its reporting obligation under New Jersey law and its agreements, TD Bank did not report this overdraft in the CLSF Premium Reserve trust account, nor did TD Bank ever correct the representations in its April 17, 2009 letter.

139.    Furthermore, TD Bank undertook no inquiry to determine the circumstances of the overdraft or to investigate the suspicious pattern of activity in Peck's other Trust Accounts.

### H.    THE SCHEME UNRAVELS.

140.    In 2011, certain investors demanded an audit of Peck's IOLTA Trust Accounts to confirm her statements that sufficient premium funds were on hand and protected.  Instead of

responding truthfully, Peck wrote to her co-conspirators seeking to coordinate an untruthful explanation to avoid having to admit that no audit could reasonably be done. This refusal to conduct an audit is an independent breach of Peck's fiduciary duty.

141.   Moens and several co-conspirators, including Laan, were arrested in Europe in 2011, and Moens's international corporate accounts were frozen. Although Peck faced what she called a "crisis," because she no longer had access to the foreign accounts to pay policy premiums, she continued to lull investors in an effort to conceal her past misconduct. During this period, Peck held herself out as an advocate for the investors.

142.   At a hearing on August 24, 2012, Peck admitted that she comingled escrowed funds from over fifty (50) different trusts to pay premiums for life insurance policies that were held by a separate Florida trusts. Peck repeatedly admitted that she "collectivized" the premium funds held for the benefit of the Class members, in violating her fiduciary duties.

143.   Peck further testified that, despite assurances of safety made to investors regarding their investments, including in the materially uniform offering materials provided to each member of the Class prior to their transfer of funds to Peck's Trust Accounts, she failed to tell investors that she did not in fact possess adequate reserves to pay insurance premiums, and instead was using new investor contributions to pay premiums on existing policies.

144.   Peck also conceded that, in 2012, in an effort to impede a court-ordered asset freeze in connection with an SEC enforcement action, she wired the remaining funds from her TD Bank trust account to Watershed and Running2 in Dubai, U.A.E. Peck made no effort to reconcile this transfer with any accounting for the trusts, nor did she attempt to document which trusts were affected by the transfer. Among these transfers are the following:

a.   On or about June 9, 2010, Peck caused to be transferred from a Trust

Account $400,000 to an account in Dubai, U.A.E., in the name of Watershed.

b.  On or about March 22, 2011, Peck caused to be transferred from a Trust Account $2 million to an account in Dubai, U.A.E., in the name of Running2.

c.  On or about March 23, 2011, Peck caused to be transferred from a Trust Account $3.5 million to an account in Dubai, U.A.E., in the name of Running2.

145.   As the authorities around the world closed in, Peck conspired with Laan and Moens to set up a Swiss account structure to keep the scheme beyond of the reach of United States authorities.  She wrote, "[t]he SEC is going to be investigating my accounts and I do not want any money here except for what Watershed sends me for premiums.  This is important as I will be investigated, probably this summer, due to Watershed's relationship with PCI, and PCI's account with me."

146.   In mid-2012, Peck, without authority, negotiated and sold the Quality Investments portfolio of insurance policies (and the *res* of approximately 60 trusts) to an Irish investment firm in a single transaction.  The undisclosed transaction provided no financial benefit for the trusts' beneficiaries and was in breach of the Irish fund legislation.  The United States Bankruptcy Judge overseeing a related bankruptcy later noted that it was inappropriate to give away the assets of a trust, as Peck did here.

147.   No registration has been filed or is in effect with the Securities and Exchange Commission or Florida's Division of Securities in connection with the investment contracts promoted by Quality Investments.  Quality Investments, with the active participation and

assistance of all of the Defendants, raised more than $223 million from investors internationally through the unregistered offer and sale of securities in the form of fractionalized interests in viatical and life settlement contracts.

148.    Peck was paid and accepted over $500,000 per year in grossly excessive fees for her "professional services."

## I.    PLAINTIFFS' INVESTMENT IN THE SCHEME.

149.    Plaintiffs, with knowledge of (i) the Quality Investments offering materials described above, (ii) the fact that Peck was an attorney admitted to practice law in the State of New Jersey in good standing, (iii) the fact that their investments were held in fiduciary trust accounts at an American bank, TD Bank, subject to United States regulations, such as the Bank Secrecy Act and the Patriot Act, and required to report certain suspicious activity and account deficiencies, (iv) the ability of the State of New Jersey to regulate the use of attorney trust accounts, as described by Peck in her letters, and (v) the ability of the State of New Jersey to regulate Peck's conduct as an attorney and to discipline her for misconduct, entered into the transactions with Defendants detailed below.

150.    Plaintiff Francois Robert Gevaerts invested approximately $240,000 to purchase a participation in a life settlement fund referred to as CLSF III/IV.   Plaintiff Francois Robert Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $400,000 upon the death of the insured individual or the occurrence of the maturity date.

151.    Plaintiff Francois Robert Gevaerts invested approximately $240,000 to purchase a participation in a life settlement fund referred to as CLSF III/IV.  Plaintiff Francois Robert

Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $400,000 upon the death of the insured individual or the occurrence of the maturity date.

152.   At or around the time Plaintiff Francois Robert Gevaerts purchased his participations in CLSF III/IV, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust III/IV Stichting Closed Life Settlement Fund III/IV UA DTD 7/9/2007. According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey The Lincoln National Life Insurance Company Policy # JF5516678 with a face value of $10,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including Plaintiff Francois Robert Gevaerts.

153.   On or about August 29, 2007, Plaintiff Francois Robert Gevaerts invested approximately $274,000 to purchase a participation in a life settlement fund referred to as CLSF IX.  Plaintiff Francois Robert Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $500,000 upon the death of the insured individual or the occurrence of the maturity date.

154.   At or around the time Plaintiff Francois Robert Gevaerts purchased his participation in CLSF IX, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust IX Stichting Closed Life Settlement Fund UA DTD 05/01/2008.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey American

General Policy # A10209839L with a face value of $5,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as Trustee for the benefit of the listed beneficiaries, including Plaintiff Francois Robert Gevaerts.

155.    Plaintiffs Francois Robert Gevaerts, Paul Christian Holstein Gevaerts and Alexander Casper Holstein Gevaerts each invested approximately $210,000 to purchase three (3) separate participations in a life settlement fund referred to as CLSF XII.  To purchase these life settlement investments Plaintiff Francois Robert Gevaerts wired the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiffs Francois Robert Gevaerts, Paul Christian Holstein Gevaerts and Alexander Casper Holstein Gevaerts were each entitled to receive a lump sum payment of $307,000 upon the death of the insured individual or the occurrence of the maturity date.

156.    At or around the time Plaintiffs Francois Robert Gevaerts, Paul Christian Holstein Gevaerts and Alexander Casper Holstein Gevaerts purchased their participations in CLSF XII, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust XII Stichting Closed Life Settlement Fund UA DTD 1/22/2008.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey Columbus Life Insurance Company Policy # CM5017892U with a face value of $5,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including Plaintiff Francois Robert Gevaerts.

157.    On May 1, 2008, Peck issued an "Annual Report" confirming (a) that Columbus Life Insurance Company Policy # CM5017892U was held in a "legal and valid trust," (b) that the trust had been evaluated by Hume P.C. for tax compliance, (c) the policy was free and unencumbered by liens, and (d) that one year of premiums were "retained within the CLSF

Premium Account held at [TD Bank]."  Despite the assurances that Peck (and Hume P.C.) made about the adequacy of the trust, the policy was not held in a Florida trust, Peck and Watershed failed to pay the premiums due on the policy, and therefore Columbus Life Insurance Company Policy # CM5017892U lapsed.  Rather than disclose the loss of the Gevaerts' investments, exposing the illusory nature of the Florida trusts organized by the Hume Defendants and Peck, Peck merely altered an exhibit to CLSF XII's trust agreement to reflect The Lincoln National Life Insurance Company Policy # LJ 7023043, an entirely different insurance policy with a face value of $5,000,000.

158.    Plaintiff Francois Robert Gevaerts invested $400,000 to purchase all participations in a life settlement fund referred to as CLSF XXII.  Plaintiff Francois Robert Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank's Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $1,250,000 upon the death of the insured individual or the occurrence of the maturity date.

159.    At or around the time Plaintiff Francois Robert Gevaerts purchased his participation in CLSF XXII, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust XXII Stichting Closed Life Settlement Fund UA DTD 6/16/2008.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey ING/Security of Denver Insurance Company Policy # 1608786 with a face value of $5,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as Trustee for the benefit of the listed beneficiary, Plaintiff Francois Robert Gevaerts.

160.    In August 2008, Plaintiff Francois Robert Gevaerts invested approximately $455,250 to purchase participations in a life settlement fund referred to as CLSF XX.  Plaintiff

Francois Robert Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $10,000,000 upon the death of the insured individual or the occurrence of the maturity date.

161.    Around the time Plaintiff Francois Robert Gevaerts purchased his participation in CLSF XX, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust XX Stichting Closed Life Settlement Fund UA DTD 4/15/2008.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey The Lincoln National Life Insurance Company Policy # JF5535499 with a face value of $10,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including Plaintiff Francois Robert Gevaerts.

162.    Plaintiff Francois Robert Gevaerts invested approximately $136,000 to purchase a participation in a life settlement fund referred to as CLSF XXVI.  Plaintiff Francois Robert Gevaerts purchased his life settlement investment by wiring the invested capital directly to one of Peck's TD Bank Trust Accounts.  In exchange for this investment of money, Plaintiff Francois Robert Gevaerts was entitled to receive a lump sum payment of $265,834 upon the death of the insured individual or the occurrence of the maturity date.

163.    Around the time Plaintiff Francois Robert Gevaerts purchased his participation in CLSF XXVI, Peck and Moens formed a Florida trust under an agreement titled The MP Trust XXVI DTD 11/28/08.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey The Lincoln National Life Insurance Company Policy # 01N1308636 with a face value of $2,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including

Plaintiff Francois Robert Gevaerts.

164.    Plaintiff Schaffels Beheer invested approximately $145,600 to purchase a participation in a fractionalized life insurance policy marketed as CLSF XXVI.  Plaintiff Schaffels Beheer purchased this life settlement investment by wiring the invested capital directly to one of Peck's Trust Accounts.  In exchange for this investment of money, Plaintiff Schaffels Beheer was entitled to receive a lump sum payment of $500,000 upon the death of the insured individual or the occurrence of the maturity date.

165.    Plaintiff Pieter Jan Willem Schaffels invested approximately $285,000 to purchase a participation in a life settlement fund referred to as CLSF XXXIV.  Plaintiff Schaffels purchased his life settlement investment by wiring the invested capital directly to Peck's Trust Accounts.  In exchange for this investment of money, Plaintiff Schaffels was entitled to receive a lump sum payment of $500,000 upon the death of the insured individual or the occurrence of the maturity date.

166.    Plaintiff Schaffels Beheer invested approximately €163,500 to purchase a participation in a fractionalized life insurance policy marketed by Watershed as CLSF XLIII.  Plaintiff Schaffels Beheer purchased this life settlement investment by wiring the invested capital directly to Peck's Trust Accounts.  In exchange for this investment, Plaintiff Schaffels Beheer was entitled to receive a lump sum payment of €300,000 upon the death of the insured individual or the occurrence of the maturity date.

167.    At or around the time Plaintiff Schaffels Beheer purchased his participation in CLSF XXVI, Peck and Watershed formed a Florida trust under an agreement entitled The MP Trust XXVI DTD 11/28/08.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey Lincoln Benefit Life Policy # 01N1308636 with a face value of

$2,000,000 to the Florida trust.  The trust agreement states that the policy would be held in trust by Peck, as Trustee, for the benefit of the listed beneficiaries, including Plaintiff Pieter Jan Willem Schaffels, owner of Schaffels Beheer B.V

168.    At or around the time Plaintiff Pieter Schaffels purchased his participation in CLSF XXXIV, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust XXXIV Stichting Closed Life Settlement Fund UA DTD 12/9/2009.  According to the trust agreement, Watershed, acting as "Trustor" and "Settler," agreed to convey John Hancock Life Insurance Company Policy # 93 707 719 with a face value of $5,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including Plaintiff Pieter Jan Willem Schaffels

169.    At or around the time Plaintiff Schaffels Beheer purchased its participation in CLSF XLIII, Peck and Moens formed a Florida trust under an agreement titled The CLSF Trust XLIII Stichting Closed Life Settlement Fund UA DTD 5/7/2010.  According to the trust agreement, Crystal Life Capital, acting as "Trustor" and "Settler," agreed to convey John Hancock Life Insurance Company Policy # 93 722 023 with a face value of $20,000,000 to the Florida trust. The trust agreement states that the policy would be held in trust by Peck, as trustee for the benefit of the listed beneficiaries, including Plaintiff Pieter Jan Willem Schaffels, owner of Schaffels Beheer.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action against Defendants pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all other persons similarly situated.  The Class which the Plaintiffs seek to represent is comprised of the following:

All persons who between January 1, 2005 and the present who purchased interests or invested in life settlements offered by Quality Investments.  Excluded from the

41

Class are (a) Quality Investments and its principals, officers, directors, and employees; (b) Defendants and their principals, officers, directors, and employees, and (c) any governmental entity.

## NUMEROSITY

171.    The Class, upon information and belief, consists of more than 1,000 individuals and entities who sent funds to Peck to be held in trust and to be used to purchase fractional interests in life insurance policies.  The Class is so numerous and geographically dispersed that joinder of all of its members is impracticable.

172.    The names and addresses of all Class members can be identified in the business records maintained by Peck.  The precise number of Class members will only be obtained through discovery but the numbers are clearly more than can be consolidated in one complaint, and it is impractical for each to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

## COMMONALITY

173.    There are questions of law and fact that are common to the claims of Plaintiffs and the entire Class.  These common questions predominate over any questions that are particular to any individual Class member.  Among such common questions of law and fact are the following:

> a.  Whether Peck had a fiduciary duty to the Class members;
>
> b.  Whether Peck breached that fiduciary duty by failing to properly administer the Trust Accounts; omitting and misrepresenting material facts in documents and representations directed to investors, regulators, and investigators that were necessary to make those documents, in light of the circumstances under which they were made, not misleading; engaging in acts, practices and a course of business which operated to deprive Plaintiffs and other members of the Class of their investment funds; and sitting silent, in the face of a duty to disclose, while Quality Investments and its principals made numerous material omissions directed to Plaintiffs and the Class, and failing to disclose to Plaintiffs and members of the

Class material information about their investments, knowing that Plaintiffs and the Class would rely on such material omissions to their detriment;

c.   Whether TD Bank, the Hume Defendants, Laan and/or the Moens Defendants aided and abetted Peck's breaches of fiduciary duty;

d.   Whether TD Bank breached its duty of reasonable care as a depository for attorney trust accounts;

e.   Whether Defendants sold unregistered and non-exempt securities in violation of Florida law;

f.   Whether the omissions made by Defendants were material and whether they damaged Plaintiffs and the Class;

g.   The amount of damages members of the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damage.

## TYPICALITY

174.    Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.  Each Class member has sustained damage as a result of Defendants' wrongful conduct in the same manner as Plaintiffs – that is, each Class member invested funds in life settlements, over which investments Peck served as trustee, through uniform offering materials, and was damaged as a result of the same conduct alleged herein.

## ADEQUACY OF REPRESENTATION

175.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

176.    To prosecute this case, Plaintiffs have chosen the law firms of Grossman Roth,

P.A. and O'Quinn Stumphauzer, P.A.  These firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## REQUIREMENTS OF FED. R. CIV. P. 23(b)(3)

### A.    PREDOMINANCE

177.    The questions of law or fact common to the claims of Plaintiffs and the Class predominate over any questions of law or fact affecting only individual Class members.

178.    Common issues predominate when, as here, liability can be determined on a class-wide basis.

179.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in the case at bar, common questions will be held to predominate over individual questions.

180.    Because all claims by Plaintiffs and the unnamed Class members are based on the same misconduct by Defendants, the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

### B.    SUPERIORITY

181.    A class action is superior to hundreds or thousands of individual actions in part because of the non-exhaustive factors listed below:

> h.    Joinder of all Class members would create extreme hardship and inconvenience because of their geographical dispersion. Class members reside throughout Europe.
>
> i.    Individual claims by the Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  As a result, individual Class members have no interest in prosecuting and controlling separate actions.
>
> j.    There are no known Class members who are interested in individually

controlling the prosecution of separate actions.

    k.  The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

182.    The action is manageable as a class action.  Individual lawsuits are not economically maintainable as individual actions.

## COUNT I
### Breach of Fiduciary Duty
### (Peck)

183.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

184.    Peck undertook to act, agreed to act, and acted as trustee for the benefit of Plaintiffs and other members of the Class.  Accordingly, a fiduciary relationship existed between Peck and the Class members, including Plaintiffs, and Peck owed Plaintiffs and the Class a fiduciary duty.

185.    Peck breached her fiduciary duties owed the Plaintiffs and the Class by, among other things:  (a) failing to properly administer the Trust Accounts; (b) omitting and misrepresenting material facts in documents and representations directed to investors, regulators, and investigators that were necessary to make those documents, in light of the circumstances under which they were made, not misleading; (c) sitting silent, in the face of a duty to disclose, while Quality Investments and its principals made numerous material omissions directed to Plaintiffs and the Class; and (d) omitting to disclose to Plaintiffs and members of the Class material information about their investments, knowing that Plaintiffs and the Class would rely on such material omissions to their detriment.

186.    By reason of the conduct alleged herein, Peck is liable for breach of her fiduciary duties.  As a direct and proximate result of that conduct, Plaintiffs and the Class have been

damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

### COUNT II
**Aiding and Abetting Breach of Fiduciary Duty**
**(Moens Defendants)**

187.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

188.    Peck breached her fiduciary duties to Plaintiffs and the Class, as set forth above.

189.    The Moens Defendants knew that Peck owed fiduciary and other obligations to Plaintiffs and the Class, and knew or recklessly disregarded the fact that Peck was breaching those obligations by engaging in the conduct alleged above.

190.    With such knowledge, the Moens Defendants knowingly participated, aided and abetted, and otherwise conspired to bring about Peck's breaches of fiduciary obligations.  The Moens Defendants rendered substantial and knowing assistance to Peck in her breach of fiduciary duties by, among other things, (a) causing and directing Peck to transfer trust assets outside of the trusts, and (b) causing and directing Peck to pay out funds as returns that were meant by investors to pay policy premiums.

191.    Plaintiffs and the Class have been damaged by the wrongful conduct of the Moens Defendants in that the wrongful conduct caused them to entrust funds to Peck and maintain their investments with her as trustee, causing Plaintiffs and the Class to lose all or nearly all of their investments.

192.    The Moens Defendants' wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Plaintiffs and the Class members.

193.    The Moens Defendants are liable for aiding and abetting Peck's breach of

fiduciary duties.  As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

### COUNT III
**Aiding and Abetting Breach of Fiduciary Duty**
**(Laan)**

194.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

195.    Peck breached her fiduciary duties to Plaintiffs and the Class, as set forth above.

196.    Laan knew that Peck owed fiduciary and other obligations to Plaintiffs and the Class, and knew or recklessly disregarded the fact that Peck was breaching those obligations by engaging in the conduct alleged above.

197.    With such knowledge, Laan knowingly participated, aided and abetted, and otherwise conspired to bring about Peck's breaches of fiduciary obligations.  Defendant Laan rendered substantial and knowing assistance to Peck in her breach of fiduciary duties by, among other things, (a) causing and directing Peck to transfer trust assets outside of the trusts, and (b) causing and directing Peck to pay out funds that were meant by investors to pay policy premiums.

198.    Plaintiffs and the Class have been damaged by the wrongful conduct of Laan in that the wrongful conduct caused them to entrust funds to Peck and maintain their investments with her as trustee, causing Plaintiffs and the Class to lose all or nearly all of their investments.

199.    Laan's wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Plaintiffs and the Class members.

200.    Defendant Laan is liable for aiding and abetting Peck's breach of fiduciary duties.

As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

**COUNT IV**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Hume Defendants)**

201.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

202.    Peck breached her fiduciary duties to Plaintiffs and the Class, as set forth above.

203.    The Hume Defendants knew that Peck owed fiduciary and other obligations to Plaintiffs and the Class, and knew or recklessly disregarded the fact that Peck was breaching those obligations by engaging in the conduct alleged above.

204.    With such knowledge, the Hume Defendants knowingly participated, aided and abetted, and otherwise conspired to bring about Peck's breaches of fiduciary obligations.  The Hume Defendants rendered substantial and knowing assistance to Peck in her breach of fiduciary duties by, among other things, (a) causing and directing Peck to transfer trust assets outside of the trusts to shell corporations, and (b) causing and directing Peck to pay out funds that were meant by investors to pay policy premiums.

205.    Plaintiffs and the Class have been damaged by the wrongful conduct of the Hume Defendants in that the wrongful conduct caused them to entrust funds to Peck and maintain their investments with her as trustee, causing Plaintiffs and the Class to lose all or nearly all of their investments.

206.    The Hume Defendants' wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Plaintiffs and the Class.

207.    The Hume Defendants are liable for aiding and abetting Peck's breach of

fiduciary duties.  As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT V
### Aiding and Abetting Breach of Fiduciary Duty
### (TD Bank)

208.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

209.    Peck breached her fiduciary duties to Plaintiffs and the Class, as set forth above.

210.    TD Bank knew that Peck owed fiduciary and other obligations to Plaintiffs and the Class, and knew that Peck was breaching those obligations by engaging in the conduct alleged above.

211.    With such knowledge, TD Bank knowingly participated, aided and abetted, and otherwise substantially assisted to bring about Peck's breaches of fiduciary obligations. Defendant TD Bank rendered substantial and knowing assistance to Peck in her breach of fiduciary duties by, among other things, (a) providing banking services to the life settlement offering, (b) establishing an IOLTA trust account for Peck, (c) disregarding overtly suspicious activity indicative of misconduct;  commingling the premium escrow accounts and using new investor funds set aside to pay premiums on new investors' specific policies to pay premiums on policies assigned to earlier investors, (d) failing to report incidents of insufficient funds in the Trust Accounts to the New Jersey Office of Attorney Ethics, (e) vouching for Peck in letters, while omitting that Peck was mishandling investor funds, and (f) sitting silently while other Defendants made numerous false and misleading material omissions related to investments made by Plaintiffs and the Class, knowing that Plaintiffs and the Class would rely on these material

omissions to their detriment.

212.   Plaintiffs and the Class have been damaged by the wrongful conduct of TD Bank in that the wrongful conduct caused them to entrust funds to Peck, causing Plaintiffs and the Class to lose all or nearly all of their investments.

213.   TD Bank's wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Plaintiffs and the Class.

214.   Defendant TD Bank is liable for aiding and abetting Peck's breach of fiduciary duties.  As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

**COUNT VI**
**Civil Conspiracy**
**(Moens Defendants, Peck, and Laan)**

215.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

216.   The Moens Defendants, Peck, and Laan agreed to unlawfully and unjustly use approximately sixty Florida trusts to solicit millions of dollars in money and property from unwitting investors.

217.   In furtherance of the conspiracy and in pursuit of the object of the conspiracy, Peck and Moens executed numerous Florida trust agreements creating the false appearance that property would be held in the State of Florida in trust, when in truth and in fact that property was misappropriated from those trusts to unjustly enrich the Moens Defendants, Peck, and Laan and others.

218.   In furtherance of the conspiracy, Laan solicited investors to transfer millions of

dollars to Peck and Moens, who were in the State of Florida, to fund the purchase of insurance policies from Watershed by the Florida trusts, when he well knew that the investors' funds would be misappropriated by the Moens Defendants, Peck, and Laan to unjustly enrich themselves and their coconspirators.

219.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

### COUNT VII
**Negligence**
**(Peck)**

220.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

221.    Peck owed a duty to use reasonable care in performing her duties as trustee to Plaintiffs and the Class.

222.    Peck breached this duty by negligently performing her duties as trustee, including without limitation her failure to oversee and administer funds and insurance policies that were supposed to be held by her in trust.

223.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

### COUNT VIII
**Attorney Malpractice and Professional Negligence**
**(Peck)**

224.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

225.    Peck was an attorney licensed to practice law in New Jersey.  Peck was hired to provide legal services to the Florida trusts.  Plaintiffs and the Class were intended beneficiaries of Peck's obligations to the trusts including as attorney.  It was foreseeable and intended by Peck that Plaintiffs and the Class would rely on her professional services in making and maintaining their investments.

226.    At all relevant times, Peck owed a duty to Plaintiffs and the Class to use such skill, prudence and diligence as other reasonable and competent members of the legal profession commonly possess and exercise in performing the professional services she contracted to perform.

227.    Peck neglected her reasonable duties as attorney to the trusts.  As alleged above, Peck breached her duties to Plaintiffs and the Class by failing to exercise due professional care in performing her legal services by, among other things, comingling client assets, misappropriating client assets, failing to disclose material changes in client investments, mismanaging client funds held in trust, and misrepresenting to clients the nature and status of their investments.

228.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## <u>COUNT IX</u>
### Attorney Malpractice and Professional Negligence- Unlicensed Practice of Law
### (Peck)

229.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

230.    Peck was an attorney admitted to practice in New Jersey, but with an office in the Southern District of Florida.  Peck was hired to provide legal services to the trusts in Florida.

Plaintiffs and the Class were intended beneficiaries of Peck's obligations to the trusts including as attorney.  It was foreseeable and intended by Peck that Plaintiffs and the Class would rely on her professional services in making and maintaining their investments.

231.    At all relevant times, Peck owed a duty to Plaintiffs and the Class to use such skill, prudence and diligence as other reasonable and competent members of the legal profession commonly possess and exercise in performing the professional services she contracted to perform.

232.    Although Peck was licensed to practice law in New Jersey, Peck was not licensed to practice law in the State of Florida.

233.    Peck neglected her reasonable duties as attorney to the trusts.  Peck breached her duties to Plaintiffs and the Class by failing to exercise due professional care in performing her legal services.

234.    In addition, while working in the State of Florida, Peck held herself our publicly, through the internet, on official firm letterhead and in e-mail correspondence, to be an attorney. Peck regularly used the title of "esquire," referenced her status as an attorney, cited her duty of confidentiality as an attorney and referred to her place of employment as a law firm. Furthermore, Peck claimed to maintain an attorney-client relationship with Watershed, invoiced and collected legal fees and provided legal advice about individuals' duties and obligations under Florida law. The Florida Supreme Court has held that these specific actions constitute the practice of law in the State of Florida.   *See The Florida Bar v. Gordon*, 661 So. 2d 295 (Fla. 1995) and *The Florida Bar v. Warren*, 655 So. 2d 1131 (Fla. 1995).

235.    While working in the State of Florida, Peck formed corporate entities, drafted and filed charters, articles of incorporation, corporate bylaws and other documents necessary to the

establishment of corporations, and advised individuals with regard to the tax implications of holding assets in a corporate name. The Florida Supreme Court has held that these actions constitute the practice of law in the State of Florida. *See The Florida Bar v. Town*, 174 So. 2d 395 (Fla. 1965) and *Tannenbaum v. Gerstein*, 267 So. 2d 824 (Fla. 1972).

236.   While working in the State of Florida, Peck claimed to have an attorney-client relationship with Watershed, invoiced and collected legal fees, and provided legal advice about individual duties and obligations under Florida law. The Florida Supreme Court has held that these actions constitute the practice of law in the State of Florida.

237.   While working in the State of Florida, Peck advised potential and actual beneficiaries and settlors about their procedural and substantive legal rights, privileges and obligations under the Florida Trust Code. Peck drafted and executed legal documents creating Florida trusts in which she acted as trustee, exercised control over the trust res, and made decisions on behalf of the trusts that required legal skills and knowledge. The Florida Supreme Court has held that these actions constitute the practice of law in the State of Florida.

238.   Knowing that Michael Glaser, a Colorado attorney, was not licensed to practice law in the State of Florida, Peck engaged Michael Glaser to act as counsel to the Florida trusts. In addition to this engagement, Peck solicited and re-published Glaser's legal advice and analysis of her rights and responsibilities as a trustee under the Florida Trust Code to justify the conveyance of the insurance policies sold to investors that were held in trust by her to a European finance company. The Florida Supreme Court has held that these specific actions constitute the practice of law in the State of Florida.

239.   On February 5, 2013, Peck executed a Cease and Desist Affidavit to avoid prosecution by the Florida Bar. In that Affidavit, she agreed not to "engage henceforth in . . . the

unlicensed practice of law" in Florida.

240.    As a direct and proximate result of Peck's violations of her duty of care, Plaintiffs and the Class have been damaged.

**COUNT X**
**Negligence**
**(TD Bank)**

241.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

242.    TD Bank owed a duty to Plaintiffs and the Class as beneficiaries of the Trust Accounts to use reasonable care in performing its duties as a depository of those accounts, including, among other things, the duty to (a) properly open, establish and maintain the Trust Accounts, (b) ensure that no unauthorized transfers or withdrawals from the Trust Accounts were implemented or paid, (c) devise and implement procedures and regulations for employees in order to protect funds on deposit in the Trust Accounts, (d) monitor the Trust Accounts for insufficient funds, (e) not honor checks or wire transfers drawn on the Trust Accounts when there were insufficient funds, (f) report overdrawn Trust Accounts to the New Jersey Office of Attorney Ethics, and (g) comply with all other reporting requirements applicable to the Trust Accounts under state and federal law.

243.    TD Bank breached these duties by negligently performing its obligations, including by failing to safeguard funds that were supposed to be held in trust, allowing the agreements which were supposed to govern the deposits in the Trust Accounts to be ignored or violated, failing to acknowledge, report and prevent fiduciary misappropriation in the Trust Accounts through withdrawals, transfers, and overdrafts, failing to conduct reasonable inquiry into the activities in the Trust Account even though aware of serious irregularities, failing to

notify the New Jersey Office of Attorney Ethics as to instances of insufficient funds and overdrafts in the Trust Accounts, and failing to report to state and federal authorities irregular and suspicious activities involving the Trust Accounts.

244.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT XI
### Negligent Misrepresentation
### (TD Bank)

245.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

246.    Defendant TD Bank misrepresented and omitted material facts about Peck, as set forth above.

247.    Defendant TD Bank either knew about these misrepresentations and omissions, made them without knowledge of their truth or falsity, or should have known that these representations and omissions were false.

248.    Defendant TD Bank intended to induce Plaintiffs and the Class to act on these misrepresentations and omissions.

249.     Plaintiffs and the Class justifiably relied on TD Bank's representations and omissions and suffered damages as a direct and proximate result of their justifiable reliance upon these misrepresentations and omissions.

250.    As a direct and proximate result of TD Bank's misrepresentations, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT XII
### Sale of Unregistered Securities Under the
### Florida Securities and Investor Protection Act
### (Peck, Laan, and the Moens Defendants)

251.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

252.    No registration statement was filed or in effect as required by chapter 517 of the Florida Statutes and no exemption from registration exists with respect to securities and transactions described in this Complaint.

253.    Defendants Peck, Laan, and the Moens Defendants, directly and indirectly, offered to sell, and sold, these securities to Plaintiffs and the Class from and within the State of Florida without a registration statement having been filed or being in effect as required by chapter 517 of the Florida Statutes.

254.    By reason of the foregoing, Defendants Peck, Laan, and the Moens Defendants, directly and indirectly, have violated Fla. Stat. §§ 517.07 and 517.211.

255.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT XIII
### Fraudulent Transfer *Per Se*
### (Peck and the Moens Defendants)

256.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

257.     Defendants Peck and the Moens Defendants caused funds to be transferred from Peck's Trust Accounts to accounts in the names of Watershed and Running2 in exchange for less than reasonably equivalent value, as set forth above.

258.     The transfers of these assets left Peck and the Trust Accounts unable to pay valid claims, such as those of Plaintiffs and the Class.

259.     The Moens Defendants and Peck knew, should have known, or in the exercise of reasonable diligence would have known that the transfers of these assets would leave Peck and the Trust Accounts unable to pay valid claims, such as those of Plaintiffs and the Class.

260.     The transfer of assets from Peck's IOLTA trust account to Running2's accounts in Dubai, UAE, defrauded creditors, including Plaintiffs and the Class.

261.     Because Peck did not receive reasonably equivalent value for the funds transferred from the Trust Accounts and because Peck and the Trust Accounts became insolvent because of those transfers, the transactions are fraudulent per se pursuant to Florida Statute § 726.106.

262.     As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

**COUNT XIV**
**Fraudulent Transfer By Implication**
**(Peck and the Moens Defendants)**

263.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

264.     The Moens Defendants and Peck caused funds to be transferred from Peck's Trust Accounts to accounts in the names of Watershed and Running2, as set forth above.

265. These Defendants knew, should have known, or in the exercise of reasonable diligence would have known that the transfers of these assets would leave Peck and the Trust Accounts unable to pay valid claims, such as those of Plaintiffs and the Class.

266. The transfer of assets from Peck's Trust Accounts to Running2's accounts in Dubai, UAE, defrauded creditors, including Plaintiffs and the Class.

267. Moens Defendants and Peck intended to defraud Plaintiffs and the Class by placing the funds invested by them out of their reach by means of the transfers described above.

268. The funds transferred could have been used to repay the indebtedness owed by Peck to Plaintiffs and the Class.

269. Because these Defendants' transfer was made to hinder, delay and defraud creditors, including Plaintiffs and the Class, these transfers were fraudulent pursuant to Florida Statutes § 726.105.

270. As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

**COUNT XV**
**Unjust Enrichment**
**(Moens Defendants, Laan, and Peck)**

271. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

272. Plaintiffs and the Class have conferred a benefit on the Moens Defendants, Laan, and Peck, as set forth above.

273. The Moens Defendants, Laan, and Peck had knowledge of the benefit so conferred.

274.    The Moens Defendants, Laan, and Peck accepted and retained the conferred benefit.

275.    Under the circumstances set forth above, it would be inequitable for these Defendants to retain the benefit without paying for it.

276.    As a direct and proximate result of the conduct of these Defendants, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT XVI
### Conversion
### (Moens Defendants, Laan, and Peck)

277.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

278.    The Moens Defendants, Laan, and Peck wrongfully exercised dominion over the funds belonging to Plaintiffs and the Class which was inconsistent with the ownership rights to those funds of Plaintiffs and the Class.

279.    As a direct and proximate result of that conduct, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## COUNT XVII
### Professional Malpractice and Professional Negligence
### (Hume Defendants)

280.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

281.    The Hume Defendants were hired to perform certain accounting services on, of which Plaintiffs and the Class were intended beneficiaries.   Among these services was

60

accounting for the trusts, which accounting was provided to Plaintiffs and the Class by Peck.

282.   The Hume Defendants knew that their services would be relied upon by Plaintiffs and the Class in making their investments through Quality Investments and in maintaining those investments. It was foreseeable and intended by the Hume Defendants that Plaintiffs and the Class would rely on their accounting of the trusts.

283.   At all relevant times, the Hume Defendants owed a duty to Plaintiffs and the Class to use such skill, prudence and diligence as other reasonable and competent members of the accounting profession commonly possess and exercise in performing the professional services they contracted to perform.

284.   The Hume Defendants breached their duties to Plaintiffs and the Class by failing to exercise due professional care in performing their accounting services.

285.   As a direct and proximate result of the Hume Defendants' violations of their duty of care, Plaintiffs and the Class have been damaged in connection with their purchase of fractional interests in life settlements at issue in this case.

## <u>COUNT XVIII</u>
### Declaratory Relief
### (Moens Defendants)

286.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

287.   This is an action brought for Declaratory Relief pursuant to Fla. Stat. § 86.011 and 28 U.S.C. § 2201 against the Moens Defendants, seeking a judicial determination that Watershed, Zilwood, Crystal Life, Running2, and Best Invest are the alter-egos of Moens.

288.   Because of the issues set forth in this lawsuit, there is a bona fide, actual, present and practical need for such a declaration. Specifically, the rights of Plaintiffs and the Class to

assert certain of their claims against Watershed, Zilwood, Crystal Life, Running2, and Best Invest turn in part on whether each of the entities can be deemed the alter egos of Moens.

289.    The Moens Defendants and Plaintiffs, all of whom are before the court, have an actual, present, adverse and antagonistic interest in the alter-ego issue.

290.    As alleged above, Moens maintained actual immediate control over Watershed, Zilwood, Crystal Life, Running2, and Best Invest.  Each was a shell corporation that was either is wholly-owned by Moens or dominated and controlled by him to the extent that its independence was nonexistent.

291.    Moens employed Watershed, Zilwood, Crystal Life, Running2, and Best Invest as his alter-egos to solicit investments in the scheme that is the subject of this lawsuit, conceal his participation in the scheme, prevent detection of illicit transfers in offshore accounts, avoid regulators, and to mishandle trust assets.

### COUNT XIX
### Equitable Accounting
### (Moens Defendants, Peck, and Laan)

292.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 182 of this Complaint as if set forth in full herein.

293.    Peck had a fiduciary relationship and was in contractual privity with Plaintiffs and the Class.

294.    The Moens Defendants, Peck, and Laan entered into and were participants in complex transactions as set forth above.

295.    Plaintiffs demand an accounting of the accounts related to these complex transactions and of the accounts related to the Moens Defendants, Peck, and Laan.

296.    There is no full and adequate remedy at law.

## RELIEF REQUESTED

297.    Plaintiffs respectfully request that this Court:

a)      Certify this action as a class action under Federal Rule of Civil Procedure 23;

b)      Award Plaintiffs and the Class compensatory damages against Defendants, including pre-judgment interest, under each of the counts of this Complaint;

c)      Rescission;

d)      An accounting of Deborah Peck's Trust Accounts;

e)      An accounting of Watershed's foreign and domestic accounts;

f)      An accounting of Running2's foreign and domestic accounts;

g)      An accounting of Zilwood's foreign and domestic accounts;

h)      An accounting of Best Invest's foreign and domestic accounts;

i)      An accounting of Crystal Life's foreign and domestic accounts;

j)      Award Plaintiffs and the Class their attorneys' fees, costs and expenses; and

k)      Award Plaintiffs and the Class such further relief as is appropriate in the interests of justice.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on any and all counts for which trial by jury is permitted by

law.

63

Dated this 28th day of February, 2014.

Respectfully submitted,

GROSSMAN ROTH, P.A.                 O'QUINN STUMPHUAZER, P.A.
2525 Ponce de Leon, Suite 1150      1 S.E. 3rd Avenue
Miami, Florida  33156               Suntrust International Center
(305) 442-8666/Fax: (305) 285-1668  Miami, Florida  33131
                                    (305) 371-9686/Fax:  (305) 371-9687

By: /s/David M. Buckner             By: /s/Ryan O'Quinn
David M. Buckner                    Ryan O'Quinn
Fla. Bar No. 60550                  Fla. Bar No. 513857
Seth E. Miles                       Ryan Stumphauzer
Fla. Bar No. 385530                 Fla. Bar No. 12176
Brett E. Von Borke
Fla. Bar No. 0044802
Rachel Wagner Furst
Fla. Bar No. 45155

*ATTORNEYS FOR PLAINTIFFS*
*AND THE CLASS*